**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| DOMINIC BIANCHI *et al.*, | : | |
| | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | No. 1:20-cv-03495-JKB |
| | : | |
| BRIAN E. FROSH *et al.*, | : | |
| | : | |
| | : | |
| *Defendants*. | : | |
| | : | |

**PLAINTIFFS' RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ...................................................................................................1

STATUTORY BACKGROUND.................................................................................2

ARGUMENT .........................................................................................................3

I.     The Second Amendment Protects "Arms" That Are in Common Use ...............................4

II.    The Firearms Banned by Maryland's Semiautomatic Firearm Ban
Are in Common Use ........................................................................................9

III.   A Ban on Protected Arms Is Flatly Unconstitutional .......................................16

IV.   Alternatively, Maryland's Ban Fails Any Potentially Applicable
Standard of Scrutiny ......................................................................................18

CONCLUSION.....................................................................................................28

**Cases**                                                                                    **Page**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.*,
    910 F.3d 106 (3d Cir. 2018)...............................................................13

*Billups v. City of Charleston,* 961 F.3d 673 (4th Cir. 2020) ..................................21, 22

*Brown v. Ent. Merch. Ass'n*, 564 U.S. 786 (2011) ......................................19

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ...............................21, 22

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) .......................................4, 6, 7, 8, 16

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)...................................................................18, 19

*City of Los Angeles v. Alameda Books, Inc.*,
    535 U.S. 425 (2002)...........................................................................21

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).....................20

*District of Columbia v. Heller*, 554 U.S. 570 (2008)................................1, 4, 5, 6, 7, 8, 16, 19, 23

*Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019) ..................................13, 19

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020).....................................8, 9, 13, 19, 20

*Eriline Co. S.A. v. Johnson*, 440 F.3d 648 (4th Cir. 2006) ..............................1, 28, 29

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...................................4, 14, 17, 18, 19, 20

*Friedman v. City of Highland Park*, 68 F. Supp. 3d 895 (N.D. Ill. 2014)...................14

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) .......................1, 2, 14

*Friedman v. City of Highland Park*, 577 U.S. 1039 (2015)......................................2

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016) .......................20, 21

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011).......................2, 10, 13

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015).............................21

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) .................................................8, 9

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ...........................1, 3, 7, 8, 9, 18, 20, 22, 23

*McCullen v. Coakley*, 573 U.S. 464 (2014) ..................................................21, 22

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)..................................5, 16, 17, 18

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)......................................18, 19, 28

*Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 714 F.3d 334 (5th Cir. 2013) .......................19

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015).................13

*People v. Aguilar*, 2 N.E.3d 321 (Ill. 2013).....................................................19

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)...............................19

*People v. Webb*, 131 N.E.3d 93 (Ill. 2019) ..................................................................17

*Ramirez v. Commonwealth*, 94 N.E.3d 809 (Mass. 2018) .............................................17

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ...................................18

*Shew v. Malloy*, 994 F.Supp. 2d 234 (D. Conn. 2014) .................................................15

*Staples v. United States*, 511 U.S. 600 (1994) ........................................................10, 11

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ....................................................................9

*Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) ...............................................23

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ...............................................17

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) ..............................................20

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ..................................................20

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ....................................................24

*Worman v. Healey*, 293 F. Supp. 3d 251 (D. Mass. 2018) ...........................................11

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) .....................................................11, 14

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) .........................18, 20, 21

## **Constitution and Statutes**

U.S. Const. amend. II ..................................................................................................4, 16

18 U.S.C.
    § 921(a)(20) ...............................................................................................................3
    § 922(g)(1) .................................................................................................................3

Md. Code Ann., Pub. Safety
    § 5-101(g)(3) ..............................................................................................................3
    § 5-101(r)(2) ............................................................................................................2, 9
    § 5-133(b)(1) ..............................................................................................................3
    § 5-205(b)(1) ..............................................................................................................3

Md. Code Ann., Crim. Law
    § 4-301 .....................................................................................................................2, 9
    § 4-301(h) .................................................................................................................2, 9
    § 4-302 ........................................................................................................................2
    § 4-303 ................................................................................................................2, 3, 9
    § 4-303(a) ...............................................................................................................2, 3
    § 4-303(b)(1) ..............................................................................................................2
    § 4-303(b)(2) ..............................................................................................................2
    § 4-303(b)(3) ..............................................................................................................3
    § 4-303(b)(4) ..............................................................................................................2
    § 4-303(b)(5) ..............................................................................................................2
    § 4-304 ........................................................................................................................3
    § 4-306(a) ...................................................................................................................3

Cal. Penal Code
    § 30600 ................................................................................................10, 11
    § 30605 ................................................................................................10, 11

Criminal Procedure – Firearms – Transfer, 2018 Md. Laws Ch. 251 (H.B. 1646) ......................22

D.C. Code Ann.
    § 7-2501.01(3A) ................................................................................10, 11
    § 7-2502.02(a)(6) ..............................................................................10, 11
    § 7-2505.01 ........................................................................................10, 11
    § 7-2505.02(a) ..................................................................................10, 11
    § 7-2505.02(c) ..................................................................................10, 11

Firearm Safety Act of 2013, 2013 Md. Laws Ch. 427 (S.B. 281) ........................22

Haw. Rev. Stat. § 134-8 ................................................................................10, 11

Mass. Gen. Laws ch. 140, § 131M ..............................................................10, 11

N.J. Stat.
    § 2C:39-5(f) ........................................................................................10, 11
    § 2C:39-9(g) ......................................................................................10, 11

N.Y. Penal Law
    § 265.02(7) ........................................................................................10, 11
    § 265.10(1)-(3) ..................................................................................10, 11

## Other Authorities

Amicus Curiae Br. of the Nat'l Shooting Sports Foundation in Supp. of Pet'rs,
    Friedman v. City of Highland Park, 2015 WL 5139321 ....................................14

Bloomberg, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, Fortune
    (June 20, 2018), https://bit.ly/2OJC72H ............................................................14

Centers for Disease Control and Prevention, *Recommendations To Reduce Violence Through
    Early Childhood Home Visitation, Therapeutic Foster Care, and Firearms Laws*,
    28 Am. J. Prev. Med. 6 (2005) ..............................................................................27

D'Vera Cohn et al., *Gun Homicide Rate Down 49% Since 1993 Peak; Public Unaware*,
    Pew Rsch. Ctr. (May 7, 2013), https://pewrsr.ch/3qwE94l ......................................24

*Educational Attainment in the United States: 2019*, U.S. Census Bureau
    (Mar. 30, 2020), https://bit.ly/3qBy077 ..............................................................14

*First-Time Gun Buyers Grow to Nearly 5 Million in 2020*, NSSF (Aug. 24, 2020),
    https://bit.ly/37xFH6F ........................................................................................14

James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newtown*,
    18 Homicide Studies 125 (2013) ....................................................................24, 25

Frank H. Easterbrook, *Abstraction and Authority*, 59 U. Chi. L. Rev. 349 (1992) ........................6

Dan Haar, *America's Rifle: Rise of the AR-15*, Hartford Courant (Mar. 9, 2013),
    https://bit.ly/2NFDxuD (last visited Feb. 19, 2021) ..............................................13

Robert A. Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*,
28 Am. J. Prev. Med. 40 (2005)...........................................................................27

Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*,
60 Hastings L.J. 1285 (2009) ...............................................................................13

Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*,
82 Va. L. Rev. 1 (1996) ...........................................................................................6

Gary Kleck, *Targeting Guns: Firearms and their Control* (1997)................................15

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of
Self-Defense with a Gun*, 86 J. Crim. L. & Crim'y 150 (1995), https://bit.ly/2Zv7lgj............28

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*,
20 J. Contemp. L. 381 (1994) ...........................................................................10, 12

Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban*,
*1994-2004, in* Reducing Gun Violence in America: Informing Policy with Evidence and
Analysis (Daniel W. Webster & Jon S. Vernick eds., 2013)............................................24, 26

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban:
Impacts on Gun Markets and Gun Violence, 1994-2003,* Rep. to the Nat'l Inst. of Just., U.S.
Dep't of Just. (June 2004)...........................................................................25, 26, 27

Walt Kuleck & Greg King, *The New AR-15 Complete Owner's Guide* (2014) ......................12, 13

*Shared Micromobility in the U.S.: 2018*, Nat'l Ass'n of City Transp. Offs.,
https://bit.ly/3dHb2rF (last visited Feb. 19, 2021)................................................14

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to
"Bear Arms,"* 49 Law & Contemp. Probs. 151 (1986) .........................................................28

Frank Miniter, *The Future of the Gun* (2014)..................................................................11, 15

*National Research Council, Firearms and Violence: A Critical Review*
(Charles F. Wellford et al. eds., 2005).........................................................................27

NSSF, *Industry Intelligence Report: Firearms Production in the United States*
(2020), https://bit.ly/3blGybB.....................................................................11, 13, 15

Anthony J. Pinizzotto et al., *Violent Encounters* (U.S. Dep't of Just. 2006) ..........................27

Michael Planty, Ph.D., and Jennifer L. Truman, Ph.D., *Firearm Violence, 1993–2011*,
Bureau of Just. Stats., Off. of Just. Programs, U.S. Dep't of Just. (May 2013),
https://bit.ly/37qRNhW...............................................................................................15

*Report and Recommendation of the ATF Working Group on the Importability of Certain
Semiautomatic Rifles*, BATF (July 6, 1989), https://bit.ly/2M5TGcm......................................9

*Rifle Marksmanship: M16-/M4-Series Weapons*, Dep't of the Army (2008),
https://bit.ly/3pvS3SW..............................................................................................10

Jeffrey A. Roth & Christopher S. Koper, *Impact Evaluation of the Public Safety and
Recreational Firearms Use Protection Act of 1994 (Final Report)* (Mar. 13, 1997).............26

P.K. Stefanopoulos et al., *Wound ballistics of firearm-related injuries—Part 2:*

*Mechanisms of skeletal injury and characteristics of maxillofacial ballistic trauma*,
44 Int'l J. of Oral & Maxillofacial Surgery (2015)............................................................11, 12

Josh Sugarmann, *Assault Weapons and Accessories in America*, Conclusion
(Violence Policy Center 1988), https://bit.ly/2Zx7mjH ...........................................................9

James D. Wright & Peter H. Rossi, *Armed & Considered Dangerous* (2d ed. 2008) ............. 27

**INTRODUCTION**

Maryland bans its law-abiding citizens from protecting themselves, their families, and their homes with semiautomatic firearms it inaccurately and tendentiously deems to be "assault weapons." Under the Supreme Court's decision in *District of Columbia v. Heller*, the State can justify its Semiautomatic Firearm Ban only by proving that the prohibited firearms are "not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. 570, 625 (2008).

That is a hopeless task. The semiautomatic firearms the State misleadingly calls "assault weapons" include some of the nation's most common firearms. Indeed, millions of Americans possess the firearms banned by this act for lawful purposes. These weapons are no more powerful than firearms that are not banned, and they fire at the same rate as all semiautomatics—one round for each pull of the trigger. To the extent the features that make a firearm an "assault weapon" make a functional difference at all, they promote accuracy and hence make a firearm safer and more effective for self-defense.

The Court has ordered that Plaintiffs show cause "why this case should not be dismissed *sua sponte* for plain failure to state a claim upon which relief may be granted and/or on the ground that Plaintiffs have pleaded an admission that it is impossible for them to prevail under controlling law." Order 1-2, ECF No. 26 (citation omitted). Plaintiffs acknowledge that the result they seek is contrary to *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc), and therefore that this Court "has 'no discretion' but to dismiss" Plaintiffs' complaint. *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 655 n.10 (4th Cir. 2006). Nevertheless, Plaintiffs believe that precedent should be overturned by a court competent to do so. And as shown below, Plaintiffs have non-frivolous grounds for urging the reversal of *Kolbe* in the appropriate forum. *See Kolbe*, 849 F.3d at 151–63 (Traxler, J., dissenting); *Friedman v. City of Highland Park*, 784 F.3d 406, 412–21 (7th Cir. 2015) (Manion,

J., dissenting); *Heller v. District of Columbia*, 670 F.3d 1244, 1285–91 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); *see also Friedman v. City of Highland Park*, 577 U.S. 1039 (2015) (Thomas, J., dissenting from the denial of certiorari).

## STATUTORY BACKGROUND

The State of Maryland deems scores of common semiautomatic rifles, shotguns, and pistols "assault weapons"—and bans all of them outright. Md. Code. Ann., Crim. §§ 4-301, 4-303; Pub. Safety § 5-101(r)(2). The State also has banned any "copy" of the enumerated firearms, *id.*, as well as any "copycat weapon," defined as:

> (i) a semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:
> > 1. a folding stock;
> > 2. a grenade launcher or flare launcher; or
> > 3. a flash suppressor;
> (ii) a semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;
> (iii) a semiautomatic centerfire rifle that has an overall length of less than 29 inches;
> (iv) a semiautomatic pistol with a fixed magazine that can accept more than 10 rounds;
> (v) a semiautomatic shotgun that has a folding stock; or
> (vi) a shotgun with a revolving cylinder.

Crim. § 4-301(h).

Maryland's broad ban on transporting, possessing, offering to sell, transferring, purchasing, or receiving any "assault weapon" applies to everyone who does not fall into one of a few, specific, narrow categories—primarily on-duty military personnel, law enforcement officers, and certain other government officials. *See* Crim. §§ 4-302, 4-303(b)(2), (4)–(5).

Ordinary citizens may transport or possess "assault pistol[s]" only if they possessed and registered them before June and August 1994, respectively. *Id.* § 4-303(a), (b)(1). They may transport, possess, offer to sell, sell, transfer, or purchase "assault long gun[s] and "copycat

2

weapon[s]" only if they possessed, purchased, or applied to purchase them on or before October 1, 2013. *Id.* § 4-303(a), (b)(3).

If an ordinary, law-abiding citizen keeps or bears an arm that does not fall into one of these grandfathered categories, and Maryland's Semiautomatic Firearm Ban has dubbed that arm an "assault weapon," then Defendants or their agents may seize and dispose of that arm, regardless of whether it is in common use. *See id.* § 4-304. Moreover, any ordinary, law-abiding citizen who possesses such "assault weapons," or transports them into the State, commits a criminal offense and is subject to severe sanctions, including imprisonment for up to three years for the first offense. Crim. §§ 4-303, 306(a). Further, under both state and federal law, conviction under these provisions would result in a lifetime ban on possession even of firearms that have not been prohibited as "assault weapons." *See* Pub. Safety §§ 5-101(g)(3), 5-133(b)(1), 5-205(b)(1) (Maryland law); 18 U.S.C. § 922(g)(1), § 921(a)(20) (federal law).

## ARGUMENT

At the heart of this case is a simple question: Are the semiautomatic firearms banned by Maryland "Arms" protected by the Second Amendment? If they are, their prohibition is flatly unconstitutional. This necessarily follows from the Supreme Court's decision in *Heller*, which established that law-abiding citizens are entitled to own firearms that are in common use, full stop. But in *Kolbe*, the Fourth Circuit failed to apply *Heller*'s common-use test. Instead of applying the test prescribed by Supreme Court precedent, *Kolbe* applied a test of its own devising and held that the banned arms are constitutionally unprotected because they purportedly are "like" arms that are most useful in military service. *Kolbe*, 849 F.3d at 137. The *Kolbe* majority departed from *Heller* a second time in an alternative analysis, applying a tiers-of-scrutiny balancing test advocated by Justice Breyer's *dissent* in *Heller*, but deliberately rejected by the Court. And *Kolbe* further erred

in applying the tiers-of-scrutiny test that *Heller* set aside, since under any standard of heightened constitutional scrutiny, Maryland's Semiautomatic Firearm Ban violates the Second Amendment. Thus, *Kolbe* should be overturned by a court competent to do so, and Plaintiffs' Second Amendment rights should be vindicated.

## I. The Second Amendment Protects "Arms" That Are in Common Use.

A. The text of the Second Amendment provides that "the right of the people to keep and bear *Arms*, shall not be infringed." U.S. CONST. amend. II (emphasis added). *Heller* holds that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582; *accord Caetano v. Massachusetts*, 136 S. Ct. 1027, 1027 (2016). The burden thus falls on the government to demonstrate that a particular type of bearable arm falls outside the Second Amendment's scope. *See Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir. 2011) (The government bears the burden to "establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right.").

To meet this burden, the government must show that a weapon is "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625; *see also id.* at 627 (weapons "highly unusual in society at large" are not protected). This standard is based on historical practices and "the historical understanding of the scope of the right." *Heller*, 554 U.S. at 625. On the one hand, "[t]he traditional militia" that the Second Amendment was designed to protect "was formed from a pool of men bringing arms in common use at the time for lawful purposes like self defense." *Id*. at 624 (quotation marks omitted). On the other hand, the right to bear arms coexisted with a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id*. at 627.

Courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms that ordinary citizens have

chosen to possess. While *Heller* did identify several "reasons that a citizen may prefer a handgun for home defense," the Court held that "[w]*hatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id*. at 629 (emphasis added). Thus, if the government cannot show that a certain type of weapon is "not typically possessed by law-abiding citizens for lawful purposes," *id*. at 625, that is the end of the matter—weapons of that type are protected "Arms" and cannot be banned.

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) underscores this point. In dissent, Justice Breyer argued against incorporation of the Second Amendment right because "determining the constitutionality of a particular state gun law requires finding answers to complex empirically based questions of a kind that legislatures are better able than courts to make," such as, "What sort of guns are necessary for self-defense? Handguns? Rifles? Semiautomatic weapons? When is a gun semi-automatic?" *Id.* at 922–23 (Breyer, J., dissenting). Justice Alito's controlling opinion squarely rejected this argument: "Justice BREYER is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions . . . . [W]hile his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion." *Id*. at 790–91 (plurality opinion). When determining which arms are protected, it is the choices commonly made by the American People that matter, not judges' or legislators' assessments of those choices.

It is likewise irrelevant that criminals may prefer to use a certain firearm for the same reasons that law-abiding citizens do. Justice Breyer emphasized that "the very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous." *Heller*, 554 U.S. at 711 (Breyer, J., dissenting). The *Heller* majority, by contrast, focused on the choices of law-abiding citizens, not the choices of criminals or the reasons why criminals make

those choices. *Heller* thus makes clear that focusing on how criminals might *misuse* firearms is the wrong analytical approach. Instead, the proper question under the Second Amendment is whether *law-abiding citizens* use certain arms for self-defense and other lawful purposes.

To be clear, the Second Amendment looks to the practices of the American People *nationwide*, *see Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by *American society*" for self-defense (emphasis added)); *Caetano*, 136 S. Ct. at 1032–33 (Alito, J., concurring) ("stun guns are widely owned and accepted as a legitimate means of self-defense *across the country*" (emphasis added)). Thus, it protects those who live in states or localities with a less robust tradition of protecting that right from outlier legislation (like Maryland's ban here) that falls short of national standards. In this way, the Second Amendment is similar to many other constitutional guarantees that hold state and local governments to minimum standards that are acceptable nationwide, and the Court repeatedly has acted to bring what it views as outlier jurisdictions into line with the nationwide norm. Thus, "constitutional adjudication frequently involves the justices' seizing upon a dominant national consensus and imposing it on resisting local outliers." Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*, 82 Va. L. Rev. 1, 16 (1996). More pithily, the Supreme Court "obliterates outliers." Frank H. Easterbrook, *Abstraction and Authority*, 59 U. Chi. L. Rev. 349, 370 (1992). *Heller*'s common-use test facilitates a similar outcome in the Second Amendment context. *See, e.g.*, *Heller*, 554 U.S. at 629.

Finally, the Second Amendment inquiry focuses on the choices commonly made by *contemporary* law-abiding citizens. *Heller* emphasized that the District of Columbia's "handgun ban amounts to a prohibition of an entire class of 'arms' that *is* overwhelmingly chosen by American society" for self-defense, *id.* at 628 (emphasis added), and it rejected as "bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are

protected," *id*. at 582. In *Caetano*, the Supreme Court reiterated this point, holding that "Arms" protected by the Second Amendment need not have been "in existence at the time of the Founding." 136 S. Ct. at 1027–28 (quoting *Heller*, 554 U.S. at 582). The *Caetano* Court flatly denied that a firearm's being "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id.*

B.     The en banc court in *Kolbe* did not deny that the semiautomatic firearms Maryland bans are in common use. Instead, the court interpreted *Heller* to exclude from Second Amendment protection any firearms that "are 'like' 'M-16 rifles'—'weapons that are most useful in military service,' " 849 F.3d at 135 (quoting *Heller*, 554 U.S. at 627). This position is a misreading of *Heller*, however, and should be abandoned.

The relevant passage in *Heller* is part of the Court's explanation that "dangerous and unusual weapons" are not "Arms" under the Second Amendment. To that end, the Court notes that "[i]t may be objected that if weapons that are most useful in military service—M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause." 554 U.S. at 627. To the *possibility* that weapons extremely useful in military service may be banned—if, that is, they are "highly unusual in society at large"—the Court responds: "[T]he fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." *Id.* at 627–28.

*Kolbe* seizes on the Court's oblique reference to "M-16 rifles and the like" and transmutes that aside into the key to understanding which firearms the Second Amendment protects. But far from "dr[awing] a 'bright line' . . . between weapons that are most useful in military service and those that are not," *Kolbe*, 849 F.3d at 136–37, *Heller* repeatedly *refused* to draw a line based on the usefulness of weapons in war, *see* 554 U.S. at 581, 624–25. As Justice Alito noted in his

concurrence to *Caetano*, "[T]he Second Amendment . . . protects . . . weapons as a class, regardless of any particular weapon's suitability for military use." 136 S. Ct. at 1032.

On this point, *Kolbe* directly contradicts *Heller* and, in the process, threatens to empty the key constitutional term "Arms"—and thus the Second Amendment more broadly—of meaning. As Judge Traxler noted in his dissent, "nearly all firearms can be useful in military service," 849 F.3d at 157 (Traxler, J., dissenting). Certainly, "a settler's musket, the only weapon he would likely own and bring to militia service, would be most useful in military service—undoubtedly a weapon of war," *id.* at 156 (Traxler, J., dissenting). Indeed, it would be passing strange if usefulness in military service disqualified a firearm from Second Amendment protection, as *Heller* makes clear that a primary *reason* the Second Amendment was included in the Constitution was to "prevent elimination of the militia." *Heller*, 554 U.S. at 599. The Second Amendment would not "assure the existence of a 'citizen's militia' as a safeguard against tyranny" if it left the government free to ban commonly held arms most useful in militia service. *Id.* at 600.

It is no answer to say that only *modern* weapons useful in military service are unprotected, *see Kolbe*, 849 F.3d at 143. Again, "[t]his is inconsistent with *Heller*'s clear statement that the Second Amendment 'extends . . . to . . . arms . . . that were not in existence at the time of the founding.'" *Caetano*, 136 S. Ct. at 1028. The short of it is this: *Kolbe* is flatly incompatible with *Heller* and *Caetano*. No other circuit has joined its reasoning, and the Ninth Circuit has explicitly rejected it. *Duncan v. Becerra*, 970 F.3d 1133, 1149 (9th Cir. 2020); *see also Hollis v. Lynch*, 827 F.3d 436, 445–46 (5th Cir. 2016) (affirming that "protected weapons are 'those in common use at the time,'" even "though that category at times may overlap" with the category of weapons that "are useful in the militia or military"). *Duncan*, not *Kolbe*, correctly identifies "the test announced by the Supreme Court in *Heller* and *Caetano*: Arms are not unusual if commonly owned and

typically used by law-abiding citizens for lawful purposes." *Duncan*, 970 F.3d at 1149; *accord Hollis*, 827 F.3d at 446.

## II. The Firearms Banned by Maryland's Semiautomatic Firearm Ban Are in Common Use.

Maryland bans a list of specifically identified rifles, shotguns, and handguns, Crim. §§ 4-301, 4-303; Pub. Safety § 5-101(r)(2), "copies or duplicates" of most of those firearms, *id.*, and semiautomatic firearms with certain features, *id.* §§ 4-301(h), 4-303. The modern sporting rifle, especially the AR-15, is representative of what Maryland's Semiautomatic Firearm Ban prohibits. *See Kolbe*, 849 F.3d at 120 (4th Cir. 2017). Both these facts—that Maryland targets semiautomatic firearms and that the modern sporting rifle is representative of those firearms—demonstrate that Maryland bans arms protected by the Second Amendment.

A. There is no class of firearms known as "semiautomatic assault weapons." "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . . ." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting). Anti-gun publicists promoting "assault weapons" bans have sought to exploit "the public's confusion over fully automatic machine guns versus semi-automatic assault weapons" to "increase the chance of public support for restrictions on these weapons." Josh Sugarmann, *Assault Weapons and Accessories in America*, Conclusion (Violence Policy Center 1988), https://bit.ly/2Zx7mjH; *see also Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles*, BATFE 5–6 (July 6, 1989), https://bit.ly/2M5TGcm ("[I]t is somewhat of a misnomer to refer to [semi-automatic] weapons as 'assault rifles' " because "[t]rue assault rifles are selective fire weapons that will fire in a fully automatic mode").

While "semiautomatic assault weapons" is not a recognized category of firearms, "semiautomatic" is. And it is semiautomatic firearms that Maryland's "assault weapons" ban targets. The "automatic" part of "semiautomatic" refers to the fact that the user need not manually load another round in the chamber after each round is fired. But unlike an automatic firearm, a semiautomatic firearm will *not* fire continuously on one pull of its trigger; rather, a semiautomatic firearm requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). There is a significant practical difference between a fully automatic and a merely semiautomatic firearm. According to the United States Army, for example, the maximum effective rates of fire for various M4- and M16-series firearms is between 45-65 rounds per minute in semiautomatic mode, versus 150-200 rounds per minute in automatic mode. *Rifle Marksmanship: M16-/M4-Series Weapons*, Dep't of the Army 2-1 tb1. 2-1 (2008), https://bit.ly/3pvS3SW.

There is a venerable tradition in this country of lawful private ownership of semiautomatic firearms. The Supreme Court has held as much, concluding in *Staples* that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. Semiautomatic firearms have been commercially available for over a century. *See Heller v. District of Columbia*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller II*"); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 413 (1994). Yet apart from the now-expired ten-year federal "assault weapons" ban, the Federal Government has not banned them. And currently the vast majority of the states do not ban semiautomatic "assault weapons."[1]

---

[1] In addition to Maryland, only California, Connecticut, Hawaii, Massachusetts, New Jersey, and New York, as well as the District of Columbia, have enacted bans on "assault

What is more, ownership of semiautomatic firearms is exceedingly common among law-abiding citizens. Approximately 214 million firearms were produced or imported into the U.S. market from 1991 to the start of 2019. NSSF, *Industry Intelligence Report: Firearms Production in the United States* 16 (2020), https://bit.ly/3blGybB. Of that number, nearly half (102,969,707) were rifles and shotguns. *See id.* And of the long guns possessed in the United States, just over forty percent (or 40,000,000) were semiautomatic rifles. *See id.* By 2018, some fifty-four million semiautomatic pistols and 19.8 million modern sporting rifles were in domestic circulation. *See id.* at 7. Thus, the firearms that fall within the Maryland's definition of "assault weapon" run at least into the tens of millions.

B.    It is no answer to say that Maryland bans only a subset of semiautomatic firearms. Indeed, this line of argument is foreclosed not only by *Heller* but also by *Staples*, which identified the AR-15—the archetypal "assault weapon"—as a traditionally lawful firearm. *See* 511 U.S. at 603, 611.

The firearms that Maryland bans are not distinguishable for being more dangerous than firearms that the State does not ban. Indeed, the AR-15 is typically chambered for .223in/5.56mm ammunition, *see, e.g.*, *Worman v. Healey*, 293 F. Supp. 3d 251, 258 (D. Mass. 2018), *aff'd*, 922 F.3d 26 (1st Cir. 2019), which "makes it safer to use as a home-defense gun because this lighter caliber is less likely to travel through walls," Frank Miniter, *The Future of the Gun* 35 (2014). Of course, MSRs discharge with high energy, but that is true of rifles generally, as well as some handguns. *See, e.g.*, P.K. Stefanopoulos et al., *Wound ballistics of firearm-related injuries—Part*

---

weapons," with varying definitions of the prohibited firearms. *See* Cal. Penal Code §§ 30600, 30605; Haw. Rev. Stat. § 134-8; Mass. Gen. Laws ch. 140, § 131M; N.J. Stat. §§ 2C:39-5(f), 2C:39-9(g); N.Y. Penal Law §§ 265.02(7), 265.10(1)-(3); D.C. Code Ann. §§ 7-2501.01(3A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c)).

*2: Mechanisms of skeletal injury and characteristics of maxillofacial ballistic trauma*, 44 Int'l J. of Oral & Maxillofacial Surgery 67, 68 (2015) ("Military and hunting rifles, as well as Magnum handguns, produce high-energy injuries.). In any event, "[a]bove all, potentially lethal or disabling effects depend more upon the anatomical track of the missile rather than its energy transfer characteristics." *Id.* at 69. Finally, the firearms Maryland bans also fire at the same rate as all other semiautomatics—one round for each pull of the trigger. The features banned by Maryland do not increase the rapidity with which a firearm can be fired.

To the extent the cosmetic features singled out by Maryland's Semiautomatic Firearm Ban make any functional difference, they tend to *improve* a firearm's utility and safety for self-defense and other lawful purposes. For example:

- A folding stock increases maneuverability in tight home quarters, David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 398–99 (1994), as well as enabling safe storage of defense instruments in accessible spaces.

- A flash suppressor is a "common accessory" that "reduces the flash of light" from a firearm shot, thus reducing the chance that a home-invader will mark his victim's position, as well as decreasing the homeowner's blindness—"the momentary blindness caused by the sudden flash of light from the explosion of gunpowder." *Id.* at 397.

- A semiautomatic centerfire rifle that has an overall length of less than 29 inches, but which meets the federal overall length requirement of 26 inches, is especially helpful in home-defense situations because of its reduced mass at the firearm's least supported position, helpful to those of smaller stature or less strength, and helpful to reduce the length of the barrel to better move around obstacles and through hallways, for example. *See* Walt Kuleck

& Greg King, *The New AR-15 Complete Owner's Guide* 83 (2014) (in self-defense, generally, "[t]he shortest overall length is considered a 'good thing.' ").

C.    These are all legitimate safety-improving features that law-abiding citizens may prefer to have incorporated in their semiautomatic firearms. But under *Heller*, of course, the key point is that millions of law-abiding citizens choose to possess firearms with those features. *Duncan*, 970 F.3d at 1147 ("Commonality is determined largely by statistics."); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an "Arm[]" is commonly owned because "[t]he record shows that millions . . . are owned"); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' "). This is demonstrated by the AR-15 and other modern sporting rifles, which epitomize the firearms that Maryland bans.

The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 Hastings L.J. 1285, 1296 (2009). Already in early 2013, sources estimated that there were 5 million AR-15s in private hands. Dan Haar, *America's Rifle: Rise of the AR-15*, Hartford Courant (March 9, 2013), https://bit.ly/2NFDxuD (last visited Feb. 19, 2021); *see also Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020).

The number of AR and other modern sporting rifles in circulation in the United States today approaches twenty million. *Industry Intelligence Report*, *supra*, at 7. As one contrast, apparently

ubiquitous public e-scooters numbered only 85,000 and were available in only 100 U.S. cities, as of 2018. *Shared Micromobility in the U.S.: 2018*, Nat'l Ass'n of City Transp. Offs., https://bit.ly/3dHb2rF (last visited Feb. 19, 2021). According to industry sources, as of 2018, roughly thirty-five percent of all newly manufactured guns sold in America are modern sporting rifles, Bloomberg, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, Fortune (June 20, 2018), https://bit.ly/2OJC72H, and an estimated five million Americans purchased firearms for the first time in 2020, *First-Time Gun Buyers Grow to Nearly 5 Million in 2020*, NSSF (Aug. 24, 2020), https://bit.ly/37xFH6F. Thus, millions more Americans likely own AR-style rifles now than did in 2013, when "nearly 5,000,000 people owned at least one semiautomatic assault weapon." *Worman v. Healey*, 922 F.3d 26, 35 (1st Cir. 2019). Even if ownership had not increased, so-called assault weapons would be more common than either professional or doctoral degrees.[2]

AR-style rifles are commonly and overwhelmingly possessed by law-abiding citizens for lawful purposes. In a 2013 survey of 21,942 confirmed owners of such firearms, home-defense followed (closely) only recreational target shooting as the most important reason for owning these firearms. Amicus Curiae Br. of the Nat'l Shooting Sports Foundation in Supp. of Pet'rs, Friedman v. City of Highland Park, 2015 WL 5139321, at *13; *see also Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 904 (N.D. Ill. 2014), *aff'd sub nom. Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015). Both purposes are plainly lawful (and also related, as "maintain[ing] proficiency in firearm use [is] an important corollary to . . . self-defense, *Ezell*, 651 F.3d at 708). "An additional survey estimated that approximately 11,977,000 people participated in target shooting with a modern sporting rifle," *Friedman*, 68 F. Supp. 3d at 904, and indeed the

---

[2] As of 2019, only 4,557,000 noninstitutionalized civilians had doctoral degrees, and still fewer— 3,150,000—had professional degrees. *Educational Attainment in the United States: 2019*, U.S. Census Bureau tbl. 1 (Mar. 30, 2020), https://bit.ly/3qBy077.

"AR-15 type rifle . . . is the leading type of firearm used in national matches and in other matches sponsored by the congressionally established Civilian Marksmanship program." *Shew v. Malloy*, 994 F.Supp. 2d 234, 245 n.40 (D. Conn. 2014). Overall, AR-style rifles "are popular with civilians and law enforcement around the world because they're accurate, light, portable, and modular. . . . [The AR-style rifle is] also easy to shoot and has little recoil, making it popular with women. The AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves." Miniter, *supra*, at 35.

The fact that "assault weapons" form only a tiny fraction of guns used in crime underscores that AR-15s and other banned firearms are commonly possessed by law-abiding citizens for lawful purposes. Indeed, evidence indicates that "well under 1% [of crime guns] are 'assault rifles.' " Gary Kleck, *Targeting Guns: Firearms and their Control* 112 (1997). Rounding up to 1% results in an estimate that AR-style rifles were used in 4,784 gun crimes in 2011. *See* Michael Planty, Ph.D., and Jennifer L. Truman, Ph.D., *Firearm Violence, 1993–2011*, Bureau of Just. Stats., Off. of Just. Programs, U.S. Dep't of Just. 1 (May 2013), https://bit.ly/37qRNhW (478,400 victims of gun crime in 2011). But by 2011, there were roughly nine million AR-style rifles in circulation in the United States. *See Industry Intelligence Report*, *supra*, at 7. Thus, even if every crime committed with a rifle in 2011 had been committed with a different AR-style rifle (and plainly it was not, as many incidents involved multiple victims), *more than 99.95%* of AR-style rifles were not used in a gun crime that year and thus were owned for lawful purposes.

D.     Finally, the Supreme Court's decision in *Caetano* further confirms that the arms banned by Maryland are in common use. That case concerned Massachusetts's ban on the possession of stun guns, which the Commonwealth's highest court had upheld on the basis that

such weapons are not protected by the Second Amendment. With a brief *per curiam* opinion, the Supreme Court vacated that decision. Though the Court remanded the case back to the state court without deciding whether stun guns are constitutionally protected, Justice Alito filed a concurring opinion expressly concluding that those arms "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." 136 S. Ct. at 1033 (Alito, J., concurring). Of course, that is far fewer than the millions of semiautomatic firearms sold to private citizens nationwide that Maryland bans.

**III.   A Ban on Protected Arms Is Flatly Unconstitutional.**

A.    Given that the Second Amendment extends to the arms that Maryland bans, *Heller* makes the next analytical steps clear. The text of the Second Amendment provides that "the right of the people to keep and bear Arms, *shall not be infringed*." U.S. CONST. amend. II (emphasis added). In this light, in *Heller*, the Supreme Court held that the Second Amendment "*elevates above all other interests* the right of law-abiding, responsible citizens to use *arms* in defense of hearth and home." 554 U.S. at 634–35 (emphases added). Thus, all that needs to be done to resolve a challenge to a flat ban on possession of certain weapons is to determine whether they are "Arms" protected by the Second Amendment. Any further evaluation of allegedly competing public-policy considerations is foreclosed by the constitutional text. That text is the "very *product* of an interest balancing by the people," and "[t]he very enumeration of the right [to keep and bear arms] takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id*.

*McDonald* confirms this understanding of *Heller*. There, the Court explained that,

in *Heller*, we held that individual self-defense is the central component of the Second Amendment right. Explaining that the need for defense of self, family, and

16

property is most acute in the home, we found that this right applies to handguns because they are the most preferred firearm in the nation to keep and use for protection of one's home and family. Thus, we concluded, citizens must be permitted to use handguns for the core lawful purpose of self-defense.

130 S. Ct. at 3036 (citations, emphasis, quotation marks, and brackets omitted). In short, because the Court found that the Second Amendment "*applies* to handguns," it concluded that "citizens *must* be permitted to use" them. *Id.* (emphases added).

Then in *Caetano*, the Court summarily and unanimously reversed a decision of the Massachusetts Supreme Judicial Court that had departed from this approach in upholding a ban on stun guns. The Massachusetts court got the message: "Having received guidance from the Supreme Court in *Caetano II*, we now conclude that stun guns are 'arms' within the protection of the Second Amendment. Therefore, under the Second Amendment, the possession of stun guns may be regulated, but not absolutely banned." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). Soon thereafter, the Illinois Supreme Court ruled likewise, holding that, because "stun guns and tasers are bearable arms that fall within the scope of the second amendment," a ban on such weapons "necessarily cannot stand." *People v. Webb*, 131 N.E.3d 93, 97–98 (Ill. 2019). So too here, because the Second Amendment applies to the semiautomatic firearms at issue in this case, Maryland's provision categorically banning those arms necessarily cannot stand.

B.    Instead of *Heller*'s history-and-tradition approach, however, *Kolbe* in its alternative analysis applied means-end scrutiny, citing its earlier decision in *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010). *Chester*, however, involved a challenge to the federal ban on domestic violence offenders possessing firearms, not a ban on law-abiding citizens owning some of the most popular firearms in the nation. This should have made a difference. For example, the Seventh Circuit, despite typically applying a levels-of-scrutiny inquiry to Second Amendment claims, has recognized that certain laws are so antithetical to the Second Amendment that they are

"categorically unconstitutional." *Ezell*, 651 F.3d at 703. Thus, it has held that the State of Illinois's "flat ban on carrying ready-to-use guns outside the home" was flatly unconstitutional. *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012); *accord Wrenn v. District of Columbia*, 864 F.3d 650, 666 (D.C. Cir. 2017) (invalidating a carry ban under "*Heller I*'s categorical approach . . . even though our previous cases have always applied tiers of scrutiny to gun laws"). As *Heller* demonstrates, a law banning possession of protected arms is the paradigmatic example of a law entirely inconsistent with the Second Amendment, and such laws are flatly unconstitutional regardless of whether a means-ends scrutiny test is applied to less burdensome laws.

## IV. Alternatively, Maryland's Ban Fails Any Potentially Applicable Standard of Scrutiny.

A.      Even if Maryland's Semiautomatic Firearm Ban were not *categorically* unconstitutional, it should at the least be subjected to the highest level of constitutional scrutiny. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778. *Kolbe*'s application of merely intermediate scrutiny, by contrast, relegates the Second Amendment to "a second-class right." *Id.* at 780 (plurality opinion).

B.      *Kolbe* attempted to justify its milquetoast approach by pointing out that Maryland does not ban all firearms and by denying that assault weapons constitute a class of firearms comparable to the class of handguns protected in *Heller*. 849 F.3d at 138. The *Kolbe* court had no authority, however, for the notion that only an absolute or near-absolute ban of all firearms triggers strict scrutiny, a rule that is unimaginable in other constitutional contexts. *See, e.g.*, *Church of the*

*Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (applying strict scrutiny although plaintiff remained free to perform many religious practices); *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 798 (2011) (applying strict scrutiny although plaintiff remained free to engage in almost all speech).

Certainly, nothing in *Heller* suggests such an approach. There, the Supreme Court applied a test stricter than strict scrutiny to a possession ban on handguns even in the absence of a similar ban on long guns. *See Heller*, 554 U.S. at 629, 635. And *Heller* in no way intimated that the result would have been different had the District of Columbia banned, not all handguns, but only a subset that included the most popular and reliable models. Again, "[i]t is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Id*. at 629. As the D.C. Circuit decision affirmed by *Heller* put it, the District's attempt to justify its handgun ban on the grounds that " 'residents still have access to hundreds more' " types of firearm was "frivolous." *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007); *see also Duncan*, 970 F.3d at 1156. Thus, "restating the Second Amendment right in terms of what IS LEFT after the regulation rather than what EXISTED historically, as a means of lowering the level of scrutiny, is exactly backward from *Heller*'s reasoning." *Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 714 F.3d 334, 345 (5th Cir. 2013) (Jones, J., dissenting from denial of reh'g en banc) (emphasis in original); *accord Duncan*, 366 F. Supp. 3d at 1157.

Courts do not always apply intermediate scrutiny in Second Amendment cases. As explained above, the Seventh Circuit struck down restrictions on carrying firearms in public as categorically inconsistent with the Second Amendment. *Moore*, 702 F.3d at 940. The Illinois Supreme Court did the same. *People v. Aguilar*, 2 N.E.3d 321, 327–28 (Ill. 2013). The Seventh Circuit applied a standard "more rigorous" than intermediate scrutiny "if not quite 'strict

scrutiny' " to order Chicago's ban on shooting ranges preliminarily enjoined. *Ezell*, 651 F.3d at 708. And even more to the point, the Ninth Circuit has recently applied strict scrutiny to a ban on a subset of "Arms"—only some, not all, magazines. *Duncan*, 970 F.3d at 1152. The Ninth and Seventh Circuits' approach is particularly noteworthy because both courts have applied intermediate scrutiny to other Second Amendment challenges. *See United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013); *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010). The *Kolbe* court, at a minimum, should have done likewise.

C.      At any rate, Maryland's Semiautomatic Firearm Ban fails even under intermediate scrutiny.

1.      That is so, first, as a matter of law. By design, the Ban is intended to reduce firearm violence *by reducing the types of firearms available to the public*. *See Kolbe*, 849 F.3d at 140 ("[T]he primary goal of the FSA 'is to reduce the availability of assault long guns . . . .'"). That is "not a permissible strategy"—even if used as a means to the further end of increasing public safety. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. District of Columbia*, 864 F.3d 650. That conclusion follows directly from the Supreme Court's precedents in the secondary-effects area of free-speech doctrine.

The Supreme Court has held that governmental restrictions on certain types of expressive conduct—most commonly, zoning ordinances that apply specifically to establishments offering adult entertainment—are subject to merely intermediate scrutiny even though they are content-based. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986). But this lesser scrutiny applies only so long as the *purpose and effect* of the restrictions is to reduce the negative "secondary effects" of the expression—such as the increased crime that occurs in neighborhoods with a high concentration of adult theaters—rather than to suppress the expression itself. *Id.* at 49.

As Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books, Incorporated*, 535 U.S. 425 (2002), makes clear, in defending a restriction as narrowly tailored to further an important or substantial governmental interest, the government must not rely on the proposition "that it will reduce secondary effects by reducing speech in the same proportion." *Id.* at 449. "It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech." *Id.* at 450; *see also Heller v. District of Columbia (Heller III)*, 801 F.3d 264, 280 (D.C. Cir. 2015); *Grace*, 187 F. Supp. 3d at 148.

But that is precisely what Maryland has done here. Its Semiautomatic Firearm Ban does not regulate the *manner* of bearing arms or impose reasonable training and safety requirements. No, the Ban's purpose and effect is to *restrict the types of firearms available to the public*. Prohibitions such as the Ban thus "destroy[ ] the ordinarily situated citizen's right to bear arms not as a side effect of applying other, reasonable regulations . . . but by design." *Wrenn*, 864 F.3d at 666. That is "not a permissible strategy," *Grace*, 187 F. Supp. 3d at 148, under any level of heightened scrutiny.

2.      Even if the purpose and effect of banning certain semiautomatic arms were not *intrinsically* unconstitutional, Maryland's ban would still fail constitutional muster because it is not sufficiently tailored to the government's asserted goals—in two separate ways. To survive intermediate scrutiny, first, the State must have considered alternatives to the course it adopted. *McCullen v. Coakley*, 573 U.S. 464, 494–95 (2014); *accord Bruni v. City of Pittsburgh*, 824 F.3d 353, 367–68 (3d Cir. 2016). "In other words, the government is obliged to demonstrate that it actually tried or considered less-[arms-bearing]-restrictive alternatives and that such alternatives were inadequate to serve the government's interest." *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020). Second, there must be "a close fit between ends and means," *McCullen*, 573

U.S. at 486; *accord Bruni*, 824 F.3d at 365. That is, the government "must prove that the law in dispute does not 'regulate [bearing arms] in such a manner that substantial portion of the burden on [arms-bearing] does not serve to advance its goals," *Billups*, 961 F.3d at 688 n.9 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). Maryland's law is not sufficiently tailored in *either* sense.

The Ban fails the first *McCullen* requirement because nothing on the face of the statutes establishing Maryland's Semiautomatic Firearm Ban suggests that Maryland considered less restrictive alternatives. *See* Firearm Safety Act of 2013, 2013 Md. Laws Ch. 427 (S.B. 281); Criminal Procedure – Firearms – Transfer, 2018 Md. Laws Ch. 251 (H.B. 1646). To "justify its choice to adopt the [Semiautomatic Firearm Ban]," Maryland "would have to show either that substantially less-restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out for good reason." *See Bruni*, 824 F.3d at 370. These statutes do not even generally "say that other approaches have not worked," which in any event is "not enough" to overcome "the vital [Second] Amendment interests at stake." *See McCullen*, 573 U.S. at 496. Under the Second Amendment, Maryland unconstitutionally chose to "forego a range of alternatives—which would burden substantially less [arms-bearing] than a blanket prohibition on Plaintiffs' [possession of common arms]—without a meaningful record demonstrating that those options would fail to alleviate the problems meant to be addressed." *See Bruni*, 824 F.3d at 371.

Maryland's Semiautomatic Firearm Ban separately fails the second *McCullen* requirement because it lacks a close fit between ends and means. One end that *Kolbe* identifies is "to reduce the availability of assault long guns . . . so that when a criminal acts, he does so with a less dangerous weapon and less severe consequences." *Kolbe*, 849 U.S. at 140. Of course, the purpose of reducing the availability of "Arms" fails intermediate scrutiny for violating secondary-effects

22

doctrine, as discussed above. But its fit is faulty, too, because, as also discussed above, there is no reason to think "assault weapons" more dangerous than other firearms.

According to *Kolbe*, though, "[a]nother objective [of the Firearm Safety Act] is to prevent the unintentional misuse of assault weapons . . . by otherwise law-abiding citizens." *Id.* But there is a plain disconnect between the end of preventing unintentional misuse of something and the means of banning that thing altogether. All the worse is the fit between a ban and the end of supporting *law-abiding* citizens, who cannot be presumed to be irresponsible. Accordingly, when the Federal Government sought to ban certain speech in advertisements for fear that such speech would induce the general population to unintentionally misuse the product advertised, the Supreme Court invalidated that ban under intermediate scrutiny. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002). By the same principle, Maryland's so-called "assault weapons" ban does not reasonably fit prevention of unintentional misuse of the arms it targets.

That leaves only the broadest end that *Kolbe* identified: "the protection of its citizenry and the public safety." 849 F.3d at 139. Of course, the District of Columbia identified the same end for the handgun ban reviewed in *Heller*. Yet, the Supreme Court held that the ban would fail "any of the standards of scrutiny [the Court has] applied to enumerated constitutional rights," *Heller*, 554 U.S. at 628—including intermediate scrutiny—even though handguns are "the overwhelmingly favorite weapon of armed criminals," *id*. at 682 (Breyer, J., dissenting).

Nor does *Kolbe* court's mention of mass shootings, 849 F.3d at 140, change anything. Justice Breyer argued in dissent that the District of Columbia's handgun ban was "tailored to the urban crime problem in that it is local in scope and thus affects only a geographic area both limited in size and entirely urban." *Heller*, 554 U.S. at 682 (Breyer, J., dissenting). While this was not enough to save the District of Columbia's ban, the fit between the problem of mass shootings and

Maryland's ban on certain semiautomatic firearms is not even as tight. Mass shootings, of course, generally occur in public. Yet, Maryland bans semiautomatic "assault weapons" *even in the home*. This alone demonstrates that Maryland's "complete ban" cannot be justified, for "each activity within the proscription's scope [must be] an appropriately targeted evil." *Ward*, 491 U.S. at 800. The problem of violence that takes place in public is not remedied by targeting possession of arms in the home.

Moreover, mass shootings are "particularly rare events." Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban*, *1994-2004*, *in* Reducing Gun Violence in America: Informing Policy with Evidence and Analysis 166 (Daniel W. Webster & Jon S. Vernick eds., 2013). Indeed, "[a]ccording to a Bureau of Justice statistics review, homicides that claimed at least three lives accounted for less than 1% of all homicide deaths from 1980 to 2008." D'Vera Cohn et al., *Gun Homicide Rate Down 49% Since 1993 Peak; Public Unaware*, Pew Rsch. Ctr. 4 (May 7, 2013), https://pewrsr.ch/3qwE94l. Despite the horrors of recent mass shootings, the truth is that "[m]ass shootings have not increased in number or in overall death toll, at least not over the past several decades." James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newtown*, 18 Homicide Studies 125, 128 (2013). The *only* thing that "has increased with regard to mass murder . . . is the public's fear, anxiety, and widely held belief that the problem is getting worse." *Id*. at 130.

In any event, so-called "assault weapons" bans would not prevent mass shootings. Fox and DeLateur conclude that the notion that "restoring the federal ban on assault weapons will prevent these horrible crimes" is a "myth." *Id*. at 136. "[A] comparison of the incidence of mass shootings during the 10-year window when the assault weapon ban was in force against the time periods before implementation and after expiration shows that the legislation had virtually no

effect" on mass shootings. *Id*. The problem is that the "overwhelming majority of mass murderers use firearms that would not be restricted by an assault weapons ban." *Id.* To start, in mass shootings, "semiautomatic handguns are far more prevalent . . . than firearms that would typically be classified as assault weapons." *Id.* Indeed, during the period of the federal ban, "only one quarter of . . . mass murderers killed with an assault weapon; they easily could have identified an alternate means of mass casualty if that were necessary." *Id*. Ultimately, "[e]liminating the risk of mass murder would involve extreme steps that we are unable or unwilling to take—abolishing the Second Amendment . . . and rounding up anyone who looks or acts at all suspicious." *Id*. at 141. Thus, *Kolbe*'s focus on mass shootings should only have highlighted the minimal impact Maryland's ban is likely to have on them.

More broadly, there is simply no empirical evidence for the proposition that semiautomatic "assault weapon" bans advance public safety. Research on the now-expired federal statute banning "assault weapons" reveals that such legislation has no discernible impact on firearms violence. The Justice Department's own study found that "we cannot clearly credit the ban with any of the nation's recent drop in gun violence. And, indeed, there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury, as we might have expected had the ban reduced crimes with ["assault weapons"] . . . ." Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003,* Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Just. 96 (June 2004).

The report concluded that, "[s]hould it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement." *Id.* at 3. The insurmountable problem is that criminals denied banned semiautomatic firearms will simply

substitute other firearms: "Because offenders can substitute non-banned guns . . . for banned [arms], there is not a clear rationale for expecting the ban to reduce assaults and robberies with guns."[3]

In a follow-up essay in 2013, the principal author of the Justice Department studies, Professor Koper, reiterated that, "[b]ecause offenders could substitute non-banned guns . . . , there was not a clear rationale for expecting the ban to reduce assaults and robberies with guns." *America's Experience*, *supra*, at 165. Although he noted that some stories by media journalists suggested that the federal ban "may have modestly reduced gunshot victimization had it remained in place for a longer period," *id.* at 170, 158; *see also id.* at 164-65, Koper concluded that "analyses showed no discernible reduction in the lethality or injuriousness of gun violence during the post-ban years." *Id.* at 165.

The failure of the federal ban to have *any* discernible effect on gun violence has been confirmed by two government agencies—the National Research Council and the Centers for Disease Control and Prevention—that conducted comprehensive reviews of *all* the published literature on firearms violence. The NRC and CDC both found that there is insufficient evidence

---

[3] *Id.* at 81 & n.95. These conclusions are consistent with the first study of the federal ban (done in 1997), which recognized that "[a]ny effort to estimate how the ban affected the gun murder rate must confront a fundamental problem, that the maximum achievable preventive effect of the ban is almost certainly too small to detect statistically." Jeffrey A. Roth & Christopher S. Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 (Final Report)* 79 (Mar. 13, 1997), *available at* https://urbn.is/3u91ACW. "[T]he evidence is not strong enough for us to conclude that there was any meaningful effect (i.e., that the effect was different from zero.)." *Id.* at 6. Specifically, the research "found no statistical evidence of post-ban decreases in either the number of victims per gun homicide incident, the number of gunshot wounds per victim, or the proportion of gunshot victims with multiple wounds. Nor did we find assault weapons to be overrepresented in a sample of mass murders involving guns." *Id.*

to conclude that bans on "assault weapons" or other particular firearms or firearm features have had any beneficial effect on gun violence.[4]

And Maryland's law necessarily will be *less* effective than the federal ban in curtailing criminal access to "assault weapons," for the banned items continue to be legal in the vast majority of the states that do not have laws similar to Maryland's. As Professor Koper has acknowledged, "the impact of [state 'assault weapons'] laws is likely undermined to some degree by the influx of ['assault weapons'] from other states . . . ." *Updated Assessment*, *supra*, at 81 n.95.

Furthermore, it is highly unlikely that prohibitions on certain firearms will deter any violent criminal from using one. *See, e.g.*, James D. Wright & Peter H. Rossi, *Armed & Considered Dangerous* xxxv (2d ed. 2008) ("[M]ost of the methods through which criminals acquire guns and virtually everything they ever do with those guns are *already* against the law."); Anthony J. Pinizzotto et al., *Violent Encounters* 50 (U.S. Dep't of Just. 2006) (97% of handguns used to assault law enforcement officers participating in study were acquired illegally). This means that Maryland's ban actually impairs public safety to the extent it deprives law-abiding citizens of accuracy-enhancing features that criminals continue to employ.

---

[4] *See* National Research Council, *Firearms and Violence: A Critical Review* 97 (Charles F. Wellford et al. eds., 2005) ("[G]iven the nature of the [1994 assault weapons ban], the maximum potential effect of the ban on gun violence outcomes would be very small and, if there were any observable effects, very difficult to disentangle from chance yearly variation and other state and local gun violence initiatives that took place simultaneously."); Centers for Disease Control and Prevention, *Recommendations To Reduce Violence Through Early Childhood Home Visitation, Therapeutic Foster Care, and Firearms Laws*, 28 Am. J. Prev. Med. 6, 7 (2005) (With respect to "bans on specified firearms or ammunition," the CDC Task Force found that "[e]vidence was insufficient to determine the effectiveness of [bans, for] the prevention of violence."); *see also* Robert A. Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 Am. J. Prev. Med. 40, 49 (2005).

Far from ordaining this result, the ratifiers of the Second Amendment would have rejected it. As evidenced by Thomas Jefferson's quotation book, the Founding generation was influenced by Italian penal reformer and criminologist Cesare Beccaria, who reasoned that laws forbidding the

> wear[ing] of arms … disarm[ ] those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparative importance? … [Such a law] certainly makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder.

*See* Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To Bear Arms*, 49 L. & Contemp. Probs. 151, 153-54 (1986).

The impact of such disarmament would be severe, as defensive gun uses "are about three to five times as common as criminal uses, even using generous estimates of gun crimes." Gary Kleck & Mark Gertz, *Armed Resistance to Crime*, 86 J. Crim. L. & Crim'y 150, 170 (1995), https://bit.ly/2Zv7lgj. As explained above, there are valid reasons why law-abiding citizens may prefer to possess firearms banned by Maryland for self-defense, and millions of Americans have indeed chosen to possess them. Under *Heller*, it must be the choices of these law-abiding citizens, not speculations about the effects of a ban on a small subset of gun crimes, that govern. Maryland "ha[s] to provide . . . more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety." *Moore*, 702 F.3d at 942. Because it cannot meet this burden, its ban must be invalidated, even under heightened scrutiny. *See id.*

## CONCLUSION

For the foregoing reasons, Maryland's ban on "assault weapons" violates the Second Amendment. Nevertheless, Plaintiffs concede that this Court "has 'no discretion' but to dismiss"

the complaint, *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 655 n.10 (4th Cir. 2006), because binding

Fourth Circuit precedent controls this case.

Dated: February 19, 2021 Respectfully submitted,

s/ Nicole J. Moss
Nicole J. Moss, Bar No. 20222
    *Attorney of Record*
David H. Thompson*
Peter A. Patterson*
John D. Ohlendorf*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
nmoss@cooperkirk.com

Raymond M. DiGuiseppe*
law.rmd@gmail.com
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705

Adam Kraut, Esq.*
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 476-2342
F: (215) 525-4437
akraut@fpclaw.org

   *Appearing pro hac vice*

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of February, 2021, I caused the foregoing document to be filed electronically with the Clerk of the Court through the CM/ECF System for filing and served on counsel registered to receive CM/ECF notifications in this case.

<u>s/ Nicole J. Moss</u>
Nicole J. Moss